**Joseph J. GIORDANO, Plaintiff,**

v.

**John B. THOMSON, Jr., Thomson Industries, Inc., and Danaher Corporation, Defendants.**

**No. 03–CV–5672 (JS)(JO).**

United States District Court, E.D. New York.

Sept. 6, 2005.

Ngozi E. Bolin, William Dan Boone, Esq., Bolin & Boone, New York, NY, for Plaintiff.

John T. Morin, Esq., Wormser, Kirly, Galef & Jacobs, LLP, New York, NY, for Defendants.

*MEMORANDUM & ORDER*

SEYBERT, District Judge.

On November 10, 2003, Plaintiff Joseph Giordano commenced this action against his former employer, Thomson Industries Inc. ("TII"), John B. Thomson Jr., TII's former Chairman and sole shareholder, and Danaher Corp. for damages allegedly sustained when he was terminated as Chief Financial Officer ("CFO") of TII. Plaintiff is suing under the Employee Retirement Income Security Act ("ERISA") for: (1) failure to pay severance and supplemental executive retirement plan ("SERP") benefits; (2) retaliatory interference with his rights to these benefits; and (3) refusal to timely produce pertinent information regarding his severance and SERP benefits. In addition to these ERISA-based claims, Plaintiff alleges breach of contract and implied contract relating to bonus and additional salary. Plaintiff also makes a claim for unjust enrichment.

Currently pending before this Court are Defendants' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In addition, Plaintiff requests summary judgment on the improper denial of severance and SERP benefits.

As a preliminary matter, this Court finds, as a matter of law, that TII's severance policy is an "employee welfare benefit plan" subject to ERISA. This Court also finds that TII's SERP is not an "unfunded excess benefit plan," and is also subject to ERISA. Aside from these findings, however, this Court denies summary judgment on the pending motions. In light of the competing factual evidence presented by the parties, material facts remain on all claims. The pending summary judgment motions are DENIED.

## BACKGROUND

The following background facts are not in dispute. TII was acquired by Danaher Corp. in October 2002. Prior to its sale, it was owned solely by Defendant John B. Thomson. Plaintiff was an adviser and consultant to TII for 'approximately eight years before becoming its acting CFO on May 24, 2000. As of September 1, 2000, Plaintiff served as TII's CFO.

In 2002, Plaintiff was involved in arranging for the sale of the company. On October 16, 2002, while signing a number of sale-related documents, Plaintiff refused to sign a release statement. By signing the release, Plaintiff would have waived any potential claims against TII, Danaher, and those companies'· respective officers. The potential claims included, but were not limited to, causes of action arising under ERISA. Plaintiff was terminated the following day, October 17, 2002. The instant action ensued.

## DISCUSSION

### I. *Legal Standard*

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is the moving party's burden to demonstrate the absence of any genuine issue of material fact. *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002)(citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Material facts are those which would "affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

After the movant meets his burden, it is incumbent on the non-moving party to respond with "significant probative evidence" that a dispute remains. *Id.* at 249, 106 S.Ct. 2505. The non-moving party "may not rest upon the mere allegations ... of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

In ruling on a motion for summary judgment, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. It is within this standard that the Court analyzes the instant motions.

### II. *Scope Of ERISA*

Three of Plaintiff's six claims are brought under ERISA. Before reviewing the Plaintiff's claims, this Court must first, as a preliminary matter, address whether TII's severance and SERP plans are governed by ERISA.

#### A. *Severance*

 "There is no question that a program to pay severance benefits may constitute an 'employee welfare benefit plan' " as specified by ERISA § 3, 29 U.S.C.

§ 1002. *James v. Fleet/Norstar Financial Group, Inc.*, 992 F.2d 463, 464, 467–68 (2d Cir.1993); *see also Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 7 & n. 5, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) ("[S]everance benefits are included in ERISA."). The touchstone of an ERISA plan is the presence of an "ongoing administrative program" to meet the employer's obligation. *Davis v. Commercial Bank of New York*, 275 F.Supp.2d. 418, 423–424 (S.D.N.Y.2003); *see also Kosakow v. New Rochelle Radiology Associates*, 274 F.3d 706, 737 (2d. Cir.2001). The Second Circuit has held that when determining whether a severance plan constitutes an ERISA plan the following factors shall be considered: (1) whether the employer's undertaking or obligation requires managerial discretion in its administration; (2) whether a reasonable employee would perceive an ongoing commitment by the employer to promote benefits; and (3) whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria. *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 566 (2d Cir.1998) (citing *Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 76 (2d Cir.1996)). The Second Circuit has not found any of these factors determinative. *Schonholz*, 87 F.3d at 76.

■ Given the stated "purpose of ERISA to protect workers from abuses in the administration and investment of private employee welfare and retirement plans," *Bennett v. Gill & Duffus Chemicals, Inc.*, No. 85–CV–4119, 1987 WL 34256, at *3 (S.D.N.Y. December 29, 1987)(citing H.R.Rep. No. 93–533, 93d Cong.2d Sess., *as reprinted in* 1974 U.S.C.C.A.N. 4639), this District has found that even an "unpublished severance benefits package [is] cognizable under ERISA." *Clay v. ILC Data Device Corp.*, 771 F.Supp. 40, 45 (E.D.N.Y.1991); *see also Blau v. Del Monte Corp.*, 748 F.2d 1348, 1352 (9th Cir.1984). "An ERISA plan may be created without the adoption of a formal plan, even unintentionally." *Aiena v. Olsen*, 69 F.Supp.2d 521, 532 (S.D.N.Y. 1999). An employer's past practice of awarding severance may establish that a plan exists. *Donovan v. Dillingham*, 688 F.2d 1367, 1372–73 (11th Cir.1982); *Blau*, 748 F.2d at 1355.

■ The Plaintiff argues that TII's severance policies meet the *Schonholz* criteria in light of TII's internal memorandum "Severance Practices at Thomson" (Pl.Ex. D), TII's performance over the past 12 years in awarding severance, and Plaintiff's executive-level knowledge of decision-making at TII. The Defendants, denying that the criteria are met, rely primarily on the fact that the policy was unpublished. However, the case law does not support Defendants' argument. In light of the evidence presented, this Court finds that the *Schonholz* criteria are met.

### 1. *Employer's Undertaking Or Obligation Requires Managerial Discretion In Its Administration*

On its face, TII's internal memo regarding severance states that the Vice President for Human Resources, Patrick M. Mazzeo, had the "discretion to bargain the terms of individual separation agreements" for involuntarily terminated non-union employees. Def. Marl. Aff. Ex. F at 3, ¶ G. Discretion similarly played a role in rewarding "extraordinary service." Def. Marl. Aff. Ex. F at 3, ¶ F. Defendants, while noting that Mazzeo's "flexibility to operate outside [the] guidelines [had] been ... dramatically tightened," do not deny Mazzeo's discretion in these matters. Def. Mem. in Opp. at 13; Def. Marl. Aff. C–M Ex. F at 123.

### 2. A Reasonable Employee Would Perceive An Ongoing Commitment By The Employer To Provide Benefits

Plaintiff argues that he knew from first-hand experience that TII had a severance policy by virtue of the procedures followed during the 2001 involuntary termination of Mr. Mark Levine, who reported directly to Plaintiff. Pl.Ex. I at 130, 134. Plaintiff further notes that the severance arrangements were in effect "since at least 1989," Pl.Ex. D at 1, and were incorporated into the final purchase and sale agreement of TII to Danaher, "acknowledging that TII considered ... the [s]everance [p]ractices .. an ... obligation that require[s] disclosure to Danaher." Pl. Mem. in Supp. at 12; Pl.Ex. R. ¶ c.

Defendants argue that Plaintiff had been told by Mazzeo that "it is [TII's] policy to not have a policy." Def. Marl. Aff. C–M Ex. F at 118. Defendants also emphasize that Plaintiff testified that he had not seen the severance practices memorandum. Def. Marl. Aff. C–M Ex. G at 130.

The Defendants' assertions fail to directly challenge the evidence of Plaintiff's cognition of TII's practices and his reasonable expectation that there was a long-term commitment to pay severance.

### 3. The Employer Was Required To Analyze The Circumstances Of Each Employee's Termination Separately In Light of Certain Criteria

Plaintiff argues that TII's severance practices memorandum depicts the use of discretion in awarding severance packages "according to ... criteria ... described as 'guidelines' or 'benchmarks'" throughout the memo. Pl. Ex D. Plaintiff also points out that the memo provided for severance only for those employees terminated without "cause." Pl.Ex. D at 6. Defendants assert that the kind of detailed criteria

that characterized the plan at issue in *Schonholz* are not present here. Def. Mem. in Opp. at 13. In *Schonholz*, the plan, disclosed in a memorandum to senior employees, listed the following criteria to be considered in determining whether an employee was entitled to severance: (i) whether the employee was involuntarily terminated; (ii) whether the termination was for illegal conduct or deficient performance; (iii) whether the employee was making a good-faith effort to find suitable employment; and (iv) whether other employment, if found, was similar to the employee's former organizational level and responsibility. *Schonholz*, 87 F.3d at 76.

Notwithstanding the fact that the *Schonholz* plan was disclosed to all senior employees and the TII plan was disclosed to only a handful of corporate officers, TII's severance memo discusses similar criteria. TII's severance memo makes reference to "involuntarily terminated employees," Def. Marl. Aff. Ex. F at 1, 3, suggesting the use of the first criteria in the *Schonholz* plan. The memo also notes that "[h]istorically, we have paid no severance benefits when we terminate ... a union represented hourly rated employee in a typical 'for-cause' action. . . ." *Id.* at 6. This reference to cause suggests use of the second criteria in the *Schonholz* plan. Moreover, the memo also includes extraordinary service as a factor to be considered in awarding severance, particularly for executive personnel and for personnel with very long tenure. *Id.* at 2–3.

By its own language, TII's internal memo demonstrates that the company was required to consider each employee's termination in light of particular criteria, including length of tenure, the nature of contribution to the company, whether or not the termination was voluntary, and whether or not the termination was for cause.

Thus, in light of the evidence presented to this Court, a reasonable jury could decide only that the severance plan does meet the *Schonholz* criteria, constituting an ERISA plan. As a matter of law, TII's severance policy falls within 29 U.S.C. § 1002.

### B. *SERP*

■ Unfunded excess benefit plans are exempt from ERISA. 29 U.S.C. § 1003(b)(5). An "excess benefit plan" is a plan maintained "solely" for the purpose of providing benefits beyond the contribution limits imposed by 26 U.S.C. § 415. 29 U.S.C. § 1002(36); *Catacosinos v. Applied Digital Data Systems*, 592 F.Supp. 49, 50 (E.D.N.Y.1984); *see also Petkus v. Chicago Rawhide Mfg. Co.*, 763 F.Supp. 357, 360 (N.D.Ill.1991). When a company's SERP avoids restrictions besides Section 415, the plan does not exist "solely" to diminish the impact of § 415. Such a SERP will not qualify as an ERISA-exempt, unfunded excess benefit plan. *Garratt v. Knowles*, 245 F.3d 941, 947–48 (7th Cir.2001).

■ Plaintiff argues that TII's SERP is not an unfunded executive benefits plan, and is, therefore, covered by ERISA. SERP contributions were used not only to avoid the restrictions of Section 415, but also to "extend the replacement of any forfeitures [Giordano] may [have] incur[red] from the TSRP [Thomson Retirement Savings Plan]." Pl.Ex. H.

In response, Defendants argue that the SERP does not contemplate any benefits beyond avoiding Section 415. Article II of the SERP "states specifically that it provides for contributions . . . 'that could not be made on behalf of the employee . . . due to the maximum annual defined contribution limit pursuant to Section 415 of the [Internal Revenue] Code ["IRC"].' " Def. Mem. in Opp. at 7; Def. Mazzeo Dec. Ex. B at 1.

A close examination of the SERP's language indicates, however, that the Defendants' use of ellipses drops substantive language within the document, which references limitations imposed by other IRC provisions. The document states in full:

"An excess savings plan allocation for a given plan year shall include a designated dollar amount representing the amount of year-end retirement contribution that could not be made on behalf of the employee by the company or affiliated company to the Thomson Retirement Savings Plan, ('Savings Plan'), *due to nondiscrimination rules and compensation limits pursuant to sections 401(a)(4) and 401(a)(17) of the Internal Revenue Code, or due to the maximum annual defined contribution limit pursuant to section 415 of the Code.*"

Def. Mazzeo Dec. Ex. B at 1. (Emphasis added).

The SERP, which on its face has the purpose of avoiding multiple provisions of the IRC, does not serve "solely" to avoid 26 U.S.C. § 415 limits. *See Garratt v. Knowles*, 245 F.3d at 947–48 (finding that a SERP which served to avoid both § 415 and § 401(a)(17) of the IRC did not exist "solely" to avoid § 415 limitations, and was therefore an ERISA plan). As a matter of law, the SERP is not an unfunded excess benefit plan. The SERP is governed by the ERISA provisions.

### III. Claim I: *Failure to Pay Severance and SERP Benefits*

■ ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that an action for enforcement may be brought "by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of his plan, or to clarify his right to future benefits under the terms of the plan." To

prevail under ERISA § 502(a)(1)(B), a plaintiff must (1) show that the plan is covered by ERISA, *Molyneux v. Arthur Guinness & Sons P.L.C.*, 616 F.Supp. 240, 243 (S.D.N.Y.1985); (2) establish his status as a participant or beneficiary of the plan, *Connecticut v. Physicians Health Services of Connecticut*, 287 F.3d 110, 116–117 (2d. Cir.2002), and (3) demonstrate that defendant has failed to comply with the terms of the plan, *Russell v. Northrop Grumman Corp.*, 921 F.Supp. 143, 150 (E.D.N.Y. 1996). Where a plan administrator has been given discretionary authority to interpret the plan, a plaintiff can demonstrate an employer's failure to comply by showing an arbitrary and capricious denial of plaintiff's benefit claim. *Van Wuyckhuyse v. Metro. Life Ins. Co.*, 131 F.Supp.2d 384, 387 (W.D.N.Y.2001).

Plaintiff argues that he was eligible for severance in an amount to be decided at the discretion of Vice President Mazzeo and Chief Executive Officer Beavers. Pl. Ex. D. Plaintiff also submits that TII had received a recommendation from its investment banker, Anthony Garvin at JP Morgan Chase, that up to twice Plaintiff's annual salary of $250,000, would be appropriate severance for Plaintiff given his circumstances. Pl.Ex. Z. at 38–42. Plaintiff also claims he did not receive reimbursement for the company's 2002 SERP contribution as he was promised. Pl.Ex. O; Pl.Ex. P.

Defendant claims that Plaintiff was not entitled to any severance. Under TII policy, severance was discretionary. Def. Marl. Aff. C–M. Ex. C. Moreover, even if Plaintiff was entitled to severance, the benefit would be limited to six weeks pay as defined by the company's severance policy. Def. Marl. Aff. C–M. Ex. C. Defendant also claims Plaintiff received all SERP benefits to which he was entitled. Def. Marl. Aff. Ex. H.

■ Because TII' s severance policy was "discretionary," this Court cannot determine Plaintiff's entitlement to severance as a matter of law absent a determination as to whether Plaintiff was fired for cause, and the extent to which Plaintiff's contributions to the company were considered "extraordinary." These two factors are noted in TII' s severance policy memo, and would have weighed in TII's discretionary determination of Plaintiff's severance benefit. Pl.Ex. D; Def. Marl. Aff. C–M Ex. C. Only in light of resolution of these matters can it be determined if TII's actions were "arbitrary and capricious."

Nor can this Court determine, as a matter of law, whether Plaintiff is entitled to any money from the SERP. To substantiate their arguments, Plaintiff and Defendants reference the September 2003 letter from Danaher Benefits Manager Joyce Costa to Plaintiff—each party attributes its own meaning to the correspondence. Pl.Ex. P; Def. Marl. Aff. Ex. H. Neither interpretation can be confirmed by this Court and the relative credibility certainly cannot be weighed. Defendants' motion for summary judgment and Plaintiff's motion for summary judgment on Claim I are denied.

IV. Claim II: *Retaliatory Interference*

■ Under ERISA § 510, 29 U.S.C. § 1140, to establish a prima facie case for retaliation against an employee for exercising his rights under ERISA, a plaintiff must prove that: (1) the employee was engaged in a protected activity; (2) the employer was aware of employee's participation in the protected activity; (3) the employer took adverse employment action against the employee; and (4) a causal connection existed between the protected activity and the adverse action. *Kreinik v. Showbran Photo, Inc.*, No. 02–CV–1172, 2003 WL 22339268, at *3 (S.D.N.Y. Oct.

14, 2003). It is essential that a plaintiff "show that an employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510." *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1111 (2d Cir.1988). "[A]n ERISA cause of action will not lie where the loss of benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Russell*, 921 F.Supp. at 147; *see also Titsch v. Reliance Group, Inc.*, 548 F.Supp. 983, 985 (S.D.N.Y.1982).

■ The disputed element which the Court must consider, is whether or not the firing of Plaintiff was motivated by an intent on the part of Defendant to interfere with Plaintiff's ERISA rights.

Plaintiff claims that he was fired immediately following his refusal to sign a release of his ERISA rights, because "[D]efendants . . . intended to strip [Plaintiff] of all his rights." Pl. Opp. at 16–17. Plaintiff had no obligation to sign a release in anticipation of the sale of TII. Pl.Ex. E. Plaintiff did sign all the other documents presented to him relating to the sale of TII. Pl.Ex. K at 31. As further evidence to support his theory that Defendant had a retaliatory motive, Plaintiff asserts that TII did not follow its usual procedures in carrying out his termination. Pl.Ex. N. at 138–143. In response, Defendants maintain that Plaintiff was fired for cause. Plaintiff was terminated "as a consequence of (i)[his] apparent disloyalty, (ii) the potential delay to the sales transaction caused by his conduct, and (iii) because termination of Plaintiff's employment was a condition to Danaher's willingness to close the transaction." Def. Mot. Summ. J. at 2; Def. Marl Aff. Ex T at 279–83, 286–89, Ex. V at 10–11, Ex. I, Article 2.5(b)(iv). Thus, Defendants were not motivated by the specific intent to engage in activity prohibited by Section 510. Rath-

er, TII was "left . . . with no option but to terminate [Plaintiff]." Def. Mot. Summ. J. at 10.

The evidence presented by Plaintiff suggests the plausibility of his theory that Defendants were motivated by an intent to interfere with his ERISA rights. Plaintiff does not have to prove this was Defendants' sole motivation, only that it was a motivation in Defendants' termination of Plaintiff. *Titsch*, 548 F.Supp. at 985. Accordingly, Defendants' motion for summary judgment on Claim II is denied.

## V. Claims III & IV: *Breach Of Contract and Implied Contract*

■ To successfully make a breach of contract claim in New York, a plaintiff must demonstrate: (1) formulation of a contract between plaintiff and defendant; (2) performance by plaintiff; (3) defendant's failure to perform; and (4) damage sustained. *Furia v. Furia*, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12 (2d Dep't 1986); *see also Am. Home Prod. Corp. v. CAMBR Co., Inc.*, No. 00–CV–2021, 2001 WL 79903, at *4 (S.D.N.Y. Jan.30, 2001). Because no one is expected to labor without hire, an implied contract is established when services are rendered at the request of the recipient or under circumstances from which it can fairly be inferred that both parties expected that the services would be compensated. *Shapira v. United Med. Serv., Inc.*, 15 N.Y.2d 200, 209–210, 257 N.Y.S.2d 150, 205 N.E.2d 293 (1965); *Fox v. Arctic Placer Mining & Milling Co.*, 229 N.Y. 124, 128, 128 N.E. 154 (1920). "[An implied contract] is just as binding as an express contract arising from declared intention, since in the law there is no distinction between agreements made by words and those made by conduct." *Sharp v. Patterson*, No. 03–CV–8772, 2004 WL 2480426, at *8 (S.D.N.Y. Nov, 3, 2004)(citing *Jemzura v. Jemzura*, 36

N.Y.2d 496, 504, 369 N.Y.S.2d 400, 330 N.E.2d 414 (1975)).

The parties here contest whether or not a contract was established that would have provided Plaintiff with either increased salary or a bonus at the time of TII's sale. Plaintiff claims that Defendant Thomson promised him a salary of $500,000 when the company could afford it. When the financial circumstances of the company did not allow for a doubling of Plaintiff's salary, Defendant Thomson repeatedly assured Plaintiff that he would be "taken care of" and "made whole" upon the successful sale of the company. Pl.Ex. I at 30, 33, 105, 107. Defendants deny that any such promises were made. Def. Marl. Aff. Ex. T at 293–94.

Defendants also put forth two additional defenses. First, Defendants claim that N.Y. G.O.L. § 5–701(a)(10), the Statute of Frauds ("SOF"), precludes Plaintiff's claims, because the SOF forbids unwritten contracts for fees relating to negotiating a loan. Def. Mot. Summ. J. at 11–12. Defendants, however, misconstrue the law. The law referenced refuses to recognize unwritten contracts for payment due to a "finder" or negotiator for the sale of a business. *Festa v. Gilston*, 183 A.D.2d 525, 526, 583 N.Y.S.2d 451 (1st Dep't 1992). By contrast, "breach of contract claims by one rendering services as an employee and not merely acting as a finder or negotiator fall outside of New York's Statute of Frauds." *Seneca Ins. Co., Inc. v. Morelli*, No. 95–CV–10701, 1996 WL 312230, at *2 (S.D.N.Y. June 10, 1996). Since it is not disputed that Plaintiff had employee status, his claim is not precluded by the Statute of Frauds.

Second, Defendants argue that under the Parol Evidence Rule ("PER"), the employee contract must be read as an integrated agreement, precluding Plaintiff from introducing evidence of an agreement made before or at the time the document was signed. However, consistent with the basic teachings of contracts, the PER does not preclude Plaintiff from introducing evidence of promises made subsequent to the signing of the contract, as Plaintiff does here. 6 JOHN E. MURRAY & TIMOTHY MURRAY, CORBIN ON CONTRACTS, § 574, at 153 (2005 Spring Cumulative Supplement)("[A] subsequent oral agreement is not barred by the rule against contradicting integrated writings."); *see also Regent Partners Inc. v. Parr Development Co., Inc.*, 960 F.Supp. 607, 615 (E.D.N.Y.1997); *Bailey v. Johnson*, 9 Cow. 115 (N.Y.Sup.Ct.1828)(holding that a written contract may be modified by a subsequent parol agreement). Whether promises were made to Plaintiff by Defendants, and under what circumstances, comes down to the credibility of the parties. Such a matter can be decided only by a jury. Defendants' motion for summary judgment on Claims III and IV is denied.

## VI. Claim V: *Unjust Enrichment*

A plaintiff makes a successful claim for unjust enrichment in New York when he demonstrates that (1) defendant received services provided by plaintiff, (2) defendant benefitted from the receipt of the services, and (3) under principles of equity and good conscience, defendant should be required to pay for the services. *Golden Pacific Bancorp v. Fed. Deposit Ins. Corp.*, 375 F.3d 196, 203 (2d Cir.2004)(citing *Lake Minnewaska Mountain Houses, Inc. v. Rekis*, 259 A.D.2d 797, 798, 686 N.Y.S.2d 186 (3d Dep't 1999)); *see also Bongat v. Fairview Nursing Care Ctr., Inc.*, 341 F.Supp.2d 181, 188 (E.D.N.Y.2004).

The issue contested here is whether Defendants received services from

Plaintiff that were beyond the scope of Plaintiff's duties as CFO. Plaintiff argues that he performed extra duties by managing the sale of TII. Provision of these services benefitted TII but worked to Plaintiff's detriment since he was not compensated for his assistance. Pl. Exs. F, I at 52, 58–62, 125, 158–159, N at 147–48. Plaintiff also argues that he provided personal financial advice and services to TII Chairman Thomson—beyond the scope of his employment—and was not compensated. Pl.Ex. W.

Defendants maintain that the sale of TII was not handled by Plaintiff, but rather by Anthony Garvin of JP Morgan Chase, who reported directly to Chairman Thomson. Garvin was the principal negotiator for Thomson and TII, and the principal contact with Danaher. Morin Aff. Ex. C at 91–92. Defendants further argue that the services Plaintiff performed for Chairman Thomson were within the scope of Plaintiff's duties. Marl. Aff. Ex. L.

This Court having reviewed the submission made in the instant motion cannot determine, as a matter of law, the scope of Plaintiff's employment. In consideration of the competing evidence, the Defendants' motion for summary judgment as to Claim V is denied.

VII. *Claim VI: Civil Penalties For Failure To Produce ERISA Benefit Information Within 30 Days Of Beneficiary's Request*

■■■ To successfully pursue a claim under ERISA § 502(c), 29 U.S.C. § 1132(c), a plaintiff must demonstrate that the administrator of an ERISA plan failed to comply with plaintiff's request for information within 30 days of receiving the inquiry. *Schultz v. Stoner,* 308 F.Supp.2d 289, 308 (S.D.N.Y.2004). Under ERISA, the term "administrator" is defined as "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe." 29 U.S.C. § 1002(16)(A); *see also Zito v. SBC Pension Benefit Plan,* No. 02–CV–277, 2002 WL 31060363, at *3 (D.Conn. July 18, 2002).

■■■ A plan administrator may not be held liable for requests directed to someone other than the administrator. *Hiney Printing Co. v. Brantner,* 243 F.3d 956, 961 (6th Cir.2001). Moreover, in the Second Circuit, a Plaintiff may not argue that the person to whom he directed a request was a de facto administrator. *Crocco v. Xerox Corp.,* 137 F.3d 105, 107 (2d Cir.1998). An administrator's noncompliance will be excused when "failure or refusal results from matters reasonably beyond the control of the administrator." *Klecher v. Met Life Ins. Co.,* No. 01–CV–9566, 2003 WL 21314033, at *9 (S.D.N.Y. June 6, 2003)(denying liability for an ERISA plan administrator for untimely delivery of requested documents, when a claims administrator failed to convey notice that the request had been made, and where the plan administrator timely produced documents once having received notice).

■■■ Here, it is not disputed that Plaintiff made an initial request for benefit information dated October 10, 2003, and that Defendant did not produce the appropriate documents until May 12, 2004, more than 30 days beyond the request date. The disputed issue, however, is whether the Plaintiff requested the materials from the appropriate party. Plaintiff claims that he contacted TII's former attorneys seeking specific information relevant to the company's severance policies and practices. Pl.

Ex. V. In addition, he claims to have sent a copy of his request to Mr. H. Lawrence Culp, President and CEO of Danaher. Pl. 56.1 Stmt. ¶ 55. Defendant argues that Plaintiff sought the documents from the wrong party, since TII' s prior attorneys were not the plan administrator. Def. 56.1 Stmt. ¶ 55.

Evidence has not been submitted to this Court as to whether or not the President and CEO of Danaher, or TII's former attorneys fit the statutory definition of plan administrator. Without such evidence, the Court cannot determine if Defendants' late response to Plaintiff's request deserves penalty. Defendants' motion for summary judgment on Claim VI is denied.

## VIII. Defendant Thomson's Motion For Dismissal Of Claims Against Him As An Individual

■■■ Plaintiff seeks to pierce TII's corporate veil, and impose personal liability on its Chairman, Thomson, as an "alter ego" of the company. New York courts are generally reluctant to rely on alter ego grounds as a basis for piercing the corporate veil. *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir.1990). Under New York law, piercing the corporate veil for reasons of alter ego require plaintiff to prove that: (1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff. *In re Vebeliunas,* 332 F.3d 85, 91–92 (2d Cir.2003). For a plaintiff's allegations to be sufficient, plaintiff must establish a causal relationship—that the injustice to plaintiff resulted form the misuse of the corporate form. *Kaplan v. Aspen Knolls Corp.,* 290

F.Supp.2d 335, 340 (E.D.N.Y.2003); *see also Mass v. McClenahan,* 893 F.Supp. 225, 234 (S.D.N.Y.1995).

■■■ A plaintiff may, however, hold an individual corporate officer personally liable on commitments of the corporation when the officer purported to bind himself individually. *Kamfar v. New World Rest. Group, Inc.,* 347 F.Supp.2d 38, 48–49 (S.D.N.Y.2004); *see also Lichtman v. Mount Judah Cemetery,* 269 A.D.2d 319, 320, 705 N.Y.S.2d 23 (1st Dep' t 2000) (citing *Savoy Record Co. v. Cardinal Export Corp.,* 15 N.Y.2d 1, 4, 254 N.Y.S.2d 521, 203 N.E.2d 206 (1964)). Liability may be established, though, only with "clear and explicit evidence of the agent's intention to substitute ... his personal liability for, or to, that of his principal." *McDonagh Real Estate and Dev., Ltd., v. David Kwilecki,* 158 A.D.2d 372, 373, 551 N.Y.S.2d 227 (1st Dep't 1990) (citing *Mencher v. Weiss,* 306 N.Y. 1, 4, 114 N.E.2d 177 (1953)).

Defendant Thomson argues that claims against him as an individual should be dismissed for two reasons. Thomson argues, first, that he cannot be held individually liable for Plaintiff's claims, because any action he took was on behalf of TII in his capacity as Chairman. Second, Thompson argues that while acting as Chairman of TII, he did not show any intent to substitute his personal liability for that of TII. Def. Mot. Summ. J. at 21. In response, Plaintiff makes two arguments. First, Plaintiff argues that it is appropriate to pierce the corporate veil in these circumstances because TII and Thomson were literally the same entity. Pl.Ex. T at 129–130 (noting that Thomson did not distinguish whether employees worked for the company or worked for him). Plaintiff also argues that Defendant Thomson wanted the sale because Thom-

son was experiencing a personal cash flow problem. Pl.Ex. U.

 Even if all facts were as Plaintiff alleges, Plaintiff cannot hold Defendant Thomson liable on alter ego grounds since the evidence presented does not demonstrate that damages resulted from misuse of the corporate form. *See Alter v. Bogoricin*, No. 97–CV–0662, 1997 WL 691332, at *5–6 (S.D.N.Y. Nov. 6, 1997) ("[P]laintiff seeks to convert a breach of contract claim against his former employer ... into multi-party litigation based solely on the unexceptional fact that in closely held corporations the owners typically make the employment decisions."). Since the Defendant does not demonstrate that corporate abuses lead to the violation of the agreements, this Court need not consider the remaining prongs of the "alter ego" test. *Morris v. New York State Dept. of Taxation and Finance*, 82 N.Y.2d 135, 142–43, 603 N.Y.S.2d 807, 623 N.E.2d 1157 (1993).

 Plaintiff makes a second argument, that Defendant Thomson remains individually accountable for Plaintiff's claims because Defendant personally bound himself to liability for the "Giordano Claims" when TII was sold. Pl.Ex. E. § 10.2(a)(iii) ("Seller shall indemnify, defend, save and hold harmless Buyer ... from and against any and all [l]osses incurred by any Buyer Indemnified Party and arising out of or resulting from ... the Giordano claims....").

The sale document reflects a purchase agreement among the Danaher companies, the Thomson Companies, and John B. Thomson, Jr., as an individual. John B. Thomson's signature appears on this document no fewer than five times. He signed the agreement four times in his capacity as an officer for the Thomson companies, and once for himself. Thus, Plaintiff has submitted evidence suggesting Defendant Thomson's intention to bind himself personally for liability on Plaintiff's claims. Defendant Thomson's motion to dismiss the claims against him is, therefore, denied.

*CONCLUSION*

This Court finds that TII's severance policy and their SERP are subject to ERISA. For the reasons stated above, however, this Court denies the summary judgment motions.

SO ORDERED.